# United States Tax Court

T.C. Memo. 2026-21

OTAY PROJECT LP, ORIOLE MANAGEMENT LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

———————

Docket No. 6819-20.                    Filed February 23, 2026.

———————

*George M. Gerachis, Adriana L. Wirtz, Matthew C. Hoffman, Kylan A. Kinkade, William Q. Manuel, Elizabeth A. Matthews*, and *Zachary M. Willis*, for petitioner.

*H. Barton Thomas, Matthew D. Thom, Jan M. Geht, Arvind Sabu*, and *Henry C. Bonney*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

WEILER, *Judge*: At issue in this case is a positive basis adjustment made under section 743(b)[1] to the assets of a limited partnership, Otay Project, LP (OPLP), with respect to its limited partner, Otay Project, LLC (OPLLC), resulting from the termination of OPLP on October 3, 2012. By Notice of Final Partnership Administrative Adjustment (FPAA) respondent disallowed $713,759,615 of a more than $743 million claimed deduction (Basis Deduction) reported on OPLP's Form 1065, U.S. Return of Partnership

———

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code or I.R.C.), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts have been rounded to the nearest dollar.

[*2] Income (2012 Form 1065), for the short 2012 tax year ending on October 3, 2012 (2012 tax period). The Basis Deduction is principally related to the prior positive basis adjustment to OPLLC's outside basis in OPLP, made in 2007 and totaling more than $867 million.

In the FPAA respondent disallowed OPLP's Basis Deduction on the basis of Treasury Regulation § 1.701-2 (subchapter K anti-abuse rule) and, alternatively, on the basis of the "partnership anti-abuse rule," under which respondent determined that most of the claimed deduction should be disallowed because OPLP retains the right to receive payments under certain contracts and/or incurred additional liabilities, which were erroneously excluded from the section 743(b) calculations. Respondent's FPAA also asserted two penalties, a 40% gross valuation misstatement penalty under section 6662(b)(3) and (h) and a 20% negligence penalty under section 6662(b)(1).

After petitioner timely filed its Petition, respondent filed his Answer, which asserted (as amended) that the adjustment in the FPAA—disallowing OPLP's Basis Deduction—is also supported by the legal theories of the step transaction doctrine, the common law economic substance doctrine, the codified economic substance doctrine found in section 7701(o), the substance-over-form doctrine, and Treasury Regulation § 1.460-4(k)(4). Respondent's Answer also asserts a 20% valuation misstatement penalty under section 6662(b)(3).

After concessions by the parties the issues for decision are whether (1) respondent correctly disallowed OPLP's Basis Deduction on the grounds that OPLP's section 743(b) basis adjustment should not be respected under the common law economic substance doctrine;[2] (2) the section 743(b) basis adjustment should be disallowed under one or more of respondent's alternative theories, including whether OPLP correctly calculated the section 743(b) basis adjustment and/or respondent's authority under Treasury Regulation §§ 1.701-2 and 1.460-4(k)(4);[3] and (3) the gross valuation misstatement penalty, substantial valuation misstatement penalty, and negligence penalty apply to OPLP.

---

[2] On brief respondent waives any reliance on the codified economic substance doctrine since the transactions in question predate the effective date of section 7701(o).

[3] On brief respondent does not ask this Court to apply the common-law step-transaction or substance-over-form doctrine; rather he focuses on the subchapter K anti-abuse rule.

**[*3]**                    FINDINGS OF FACT

Some of the facts are stipulated and are so found. The First through Tenth Stipulations of Facts and the attached Exhibits are incorporated herein by this reference.

OPLP is treated as a partnership subject to the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, for federal income tax purposes. Petitioner, Oriole Management, LLC (Oriole), is the tax matters partner for OPLP.[4] OPLP is organized under California law as a limited partnership with a principal place of business in San Diego, California.

I.    *Relevant History of the Baldwin Brothers*

Albert Baldwin (Al) and James Baldwin (Jim) are brothers, and both were real estate developers in Southern California. After graduating from college, Al and Jim joined their father as partners in the real estate business. Shortly thereafter, Al and Jim acquired their father's business interest and continued to operate in the real estate business for decades through Baldwin Builders, which operated as the Baldwin Co. Al and Jim were involved in the acquisition of raw land in the San Diego, California, area for subsequent development and construction of residential neighborhoods. Al and Jim developed neighborhoods including Sea Village, Carmel Del Mar, and Otay Ranch.

A.    *Acquisition and Initial Development of Otay Ranch*

In 1988 Al and Jim purchased, through the Baldwin Co., approximately 22,000 acres of raw unentitled farming land in San Diego County, California, referred to as Otay Ranch. Beginning in 1989 the Baldwin Co. developed a master planned community for Otay Ranch consisting of approximately 27,000 residential units and related civic services. During the development of Otay Ranch—which occurred in phases—it was necessary for Al and Jim to form single-purpose entities (SPEs) to acquire land for subsequent development. They formed 25 SPEs for financing purposes and defense to widespread construction defect litigation during the development of Otay Ranch.

---

[4] Before its repeal TEFRA governed the tax treatment and audit procedures for many partnerships, including OPLP.

**[\*4]** B.     *Bankruptcy of the Baldwin Entities*

During the 1980s the residential real estate market was strong in southern California, and demand for new homes exceeded supply. However, the real estate market experienced a downturn and eventual recession beginning in the 1990s. At this time Baldwin Co.'s lender declared a nonmonetary default on their loans, sweeping all cash on hand from Al and Jim's company accounts.

Consequently, Baldwin Builders filed for chapter 11 bankruptcy. At the conclusion of the bankruptcy proceedings, Al and Jim were able to retain some 5,300 acres of land within Otay Ranch.

C.     *Development of Otay Ranch After Bankruptcy*

OPLP was formed in January 1999. OPLLC contributed 5,300 acres of land to OPLP, with OPLLC owning a 99.9% general partnership interest and South Bay Project, LLC,[5] and Otay Ranch Development, LLC (ORD), collectively owning a 0.1% limited partnership interest. Under the contribution OPLP assumed all of OPLLC's obligations and liabilities with respect to the 5,300 acres of land.

OPLP acted as master developer of Otay Ranch by performing land entitlements and overseeing construction of land improvements and infrastructure, such as development of lots, roads, and utilities. Because of the size of the project, OPLP developed Otay Ranch in phases, consisting of villages. A village consisted of high-density housing, low-density single-family housing, retail, public areas, and schools (Village). In sum, and as of the time of trial, OPLP had developed 14 Villages. Development of Otay Ranch from raw land to a master planned community required an extensive entitlement process, including (but not limited to) detailed subdivision plans, approval from municipal authorities, and surety bonds guaranteeing construction of certain required infrastructure.

In the course of developing Otay Ranch, OPLP sold subdivided tracts of land to entities owned by Al and his family (AB Homebuilders) and Jim and his family (JB Homebuilders)—each of which was separately engaged in the business of constructing and selling homes (collectively, Homebuilders)—and other unrelated third-party

---

[5] South Bay Project, LLC, is a legal entity owned by the wealthy Pritzker family (third-party family).

[*5] homebuilders.[6] OPLP would sell what is referred to within the industry as "blue-top" lots, meaning lots already graded and with all necessary infrastructure required to build a home. Under the terms of its land sales to these homebuilding entities, OPLP was required to complete all necessary infrastructure, which included, among other requirements, construction of roads and public utilities (Construction Obligations).

Because of its obligations to deliver blue-top lots, OPLP elected to use the completed contract method of accounting (CCM) and defer profits under the percentage of completion method of accounting (PCM), as permitted under section 460 and Treasury Regulation § 1.460-4(d).

As one mechanism to finance the construction of infrastructure related to Otay Ranch, OPLP, as master developer, obtained reimbursements from proceeds of public bonds. More specifically, OPLP established community facility districts for taxing purposes; and as constructed homes were sold, a portion of property taxes was directed toward common infrastructure costs. The City of Chula Vista issued and sold public bonds backed by these future property taxes, thus creating a supply of funds for development and construction of infrastructure. OPLP submitted its costs to the City of Chula Vista for review and reimbursement, and over the course of development of several Villages, OPLP obtained funding for construction of infrastructure through this reimbursement mechanism.

D.    *Arbitration Between Al and Jim*

Following bankruptcy the sale of blue-top lots to AB Homebuilders and JB Homebuilders eventually led to arbitration between the brothers, lasting nearly a decade. Although Al and Jim had agreed to share profits within OPLP equally, Jim's cash withdrawals from OPLP exceeded Al's withdrawals by $18 million.

In June 2002 Al filed a demand for arbitration with AAA[7] under the terms of the partnership agreement of OPLP. Before the arbitration hearing, Al and Jim held a series of meetings with Ron Therrien, the

---

[6] Both Al and Jim involved their children in the real estate business. After the bankruptcy Al and Jim no longer jointly conducted homebuilding activities; rather, they involved their children and sons-in-law in separate Homebuilder activities. Beginning in 2002 blue-top lots developed by OPLP were sold to SPEs held by Al's Family or Jim's Family.

[7] The American Arbitration Association.

[*6] chief financial officer of OPLP, and other family members over the course of three days, December 18, 19, and 20, 2002. Following this series of meetings Al and Jim executed a memorandum of understanding written by Mr. Therrien. Al and Jim also executed an addendum to the original memorandum of understanding dated December 21, 2002, and on December 24, 2002, Al and Jim entered into another addendum to the memorandum of understanding (collectively MOU). The principal terms of the MOU involved the equitable division of all remaining parcels of land held by OPLP—with one brother, as decided by a coin flip, dividing the remaining land into two groups and the other brother having first choice of the two groups.

Later Al discovered Jim was violating the terms of the MOU and resumed his demand for arbitration. In January 2005 Jim amended his claims in arbitration, seeking, as part of his relief, dissolution of all business relationships with Al, including dissolution of all jointly owned entities. Then at a February 1, 2005, hearing, counsel for Al acknowledged Jim's right to dissolution under California law; however, Al's counsel requested the opportunity to consult with opposing counsel regarding the tax implications of dissolution. Also at the February 1, 2005, hearing, Judge Lewis advised the parties of his intent to issue an interim decision, after all evidence was presented, to allow Al and Jim, by agreement, to modify the plan for dissolution according to tax benefits.

On April 4, 2005, Judge Lewis issued his First Interim Partial Award and Order of Arbitrator (April 2005 order) addressing several issues in dispute. Judge Lewis's April 2005 order enforced the terms of the MOU between Al and Jim and provided for the division of property, including the residential lots within Villages 2, 7, 12, and 13, and a portion of Village 6 within six months. Judge Lewis performed the coin flip and declared that Jim was obligated to first divide the residential lots into two groups, and Al would have first choice of the two groups to be created by Jim.

Judge Lewis also addressed the parties' claims for dissolution. In the April 2005 order he states as follows:

> All joint entities holding title to mutually owned properties shall be dissolved within sixty (60) days of when the last piece of land is deeded out by that entity pursuant to the terms of this Award. All property transfers and divisions under the terms of this award and the MOU shall be

**[*7]**    accomplished within thirty-six (36) months from this date; unless an extension is granted for good cause shown.

At the time of the April 2005 order entitlements were underway and blue-top lots within Village 6 had been sold to Al's and Jim's respective Homebuilders. Villages 2 and 7 were still under development and included a written lotting study for development in the near future. Village 12 was a planning area that did not include residential development, while Village 13 was far from development since entitlements to land had not begun.

In the April 2005 order Judge Lewis determined there were continuing obligations under the MOU such as requiring Jim and Al to conduct future business, continuing to allow OPLP to meet its contractual obligations to complete the entitlement process, borrowing funding from the issuance of public bonds and property taxes, and continuing to receive and disburse funds collected from Al, Jim, and their family, upon the sale of future lots.

Both Al and Jim decided to retain the services of third-party legal and tax counsel to advise on implementing Judge Lewis's April 2005 order. Al and Jim retained William Wasserman, who had previously worked at the law firm of Loeb & Loeb, LLP (Loeb), and was presently working at the accounting firm of Ernst & Young, LLP (EY). Al and Jim each met with Mr. Wasserman separately and then retained EY under a master tax services agreement. In addition to EY, Al and Jim also retained Loeb to advise on implementing Judge Lewis's April 2005 order.

        E.    *Implementation of Judge Lewis's April 2005 Order*

Until December 14, 2006, OPLLC held a 99.9% sole general partnership interest in OPLP while ORD held a 0.1% limited partnership interest in OPLP. At the same time ORD held a 99% membership interest in OPLLC, while Oriole held the remaining 1% interest. Oriole was owned 50/50 by Al and Jim; while ORD was owned 50/50 by Southwind, LLC (Southwind) (an entity owned by Al and his spouse Deeann), and Forstar, LLC (Forstar) (an entity owned by Jim and his family). Between 1998 and 1999 approximately 34 SPEs were formed—all state law limited liability companies (LLCs) (34 LLCs)—to hold one or more (not yet developed) Villages of Otay Ranch. Each of the 34 LLCs was beneficially owned 50/50 by Al, Jim, or their respective families, and each LLC held a membership interest in ORD. Of the 34

[*8] LLCs formed, OPLP referred to 19 as redeeming LLCs, and the remaining 15 were referred to as nonredeeming LLCs.

In 2005 OPLP separately sold parcels of land in Village 7 to entities owned by the Homebuilders in exchange for unsecured promissory notes. In the purchase of parcels of land in Village 7, two notes were issued by JB Homebuilders in favor of OPLP, for $28,104,747 and $37,285,114 respectively, and these notes were guaranteed by Jim. In the purchase of parcels of land in Village 7 two notes were issued by AB Homebuilders in favor of OPLP, for $28,360,835 and $37,856,643 respectively, and these notes were guaranteed by Al.

By the spring of 2005 there was approximately $240 million of deferred profit under CCM, from OPLP's land sales, and the remaining land held by OPLP had an estimated built-in gain of $700 million.

In 2006 OPLP separately sold parcels of land in Villages 2 and 6 to entities owned by the Homebuilders in exchange for unsecured variable Homebuilder Notes. JB Homebuilders acquired these parcels of land through two unsecured variable Homebuilder Notes in favor of OPLP in the amounts of $1,191,010 and $26,455,718 respectively. Similarly, multiple Homebuilder Notes were issued by AB Homebuilders in favor of OPLP. Consistent with prior practice Jim guaranteed each of these promissory notes issued by JB Homebuilder, while Al guaranteed each of these promissory notices issued by AB Homebuilders.

Following OPLP's land sales of Villages 2, 6, and 7 in 2005 and 2006, AB Homebuilders owed approximately $345 million in principal and JB Homebuilders owed $329 million in principal, under the above-referenced Homebuilder Notes.

F.     *Creation and Capitalization of Finco Entities*

Both EY and Loeb provided tax planning to Al and Jim for implementing the April 2005 order, and both E&Y and Loeb advised Al and Jim that it was appropriate to restructure OPLP.

Loeb provided Al and Jim with a draft letter of intent outlining the separation of all jointly owned assets and restructuring of OPLP. However, Al and Jim ultimately could not reach an agreement on the terms of Loeb's draft letter of intent.

**[*9]** The tax planning by EY offered various potential transactions, including the outright sale of the underlying land at Otay Ranch, creation of financing companies, admission of a new general partner and conversion of OPLLC's interest to that of a limited partner, financing for Village 2, and potential for distribution of assets within OPLP to its partners. The tax advice rendered addressed division of receivables due from the Homebuilder entities owned by Al and Jim; however, the tax advice did not address a division of other joint liabilities within OPLP. Particularly it did not address the ongoing Construction Obligations within OPLP, which remained in dispute between Al and Jim. They ultimately followed the recommendations made by EY.

In December 2005 OPLP restructured certain Homebuilder Notes. JB Homebuilders paid OPLP approximately $21 million through funds borrowed from JPB Investments—an entity owned by Jim. Similarly, AB Homebuilders paid OPLP approximately $53 million through funds borrowed from Pacifica—an entity owned by Al. Simultaneously, OPLP in turn lent to JPB Investments approximately $21 million in exchange for a 15-year variable promissory note, and to Pacifica approximately $53 million in exchange for a 15-year fixed rate promissory note. Essentially, after the transaction a substantial portion of the outstanding Homebuilder Notes held by OPLP was exchanged for 15-year promissory notes issued by JPB Investments and Pacifica, respectively.

ORD also restructured loans it held with OPLP, through the transfer of $55 million in receivables owed by Pacifica to Southwind, and $63 million in receivables owed by JPB Investments to Forstar. In exchange for these two transfers of receivables, Southwind assumed liabilities of $53 million due from ORD to OPLP, while Forstar assumed liabilities of $61 million due from ORD to OPLP. Relating to this assumption of liabilities, Southwind issued a 15-year fixed rate promissory note to OPLP, and Forstar issued a 15-year variable rate promissory note to OPLP. ORD issued two separate 15-year promissory notes to OPLP, one having a fixed and one having a variable rate. The restructuring of these notes moved the indebtedness from ORD—an entity jointly owned by Al and Jim—to their respective separate entities Southwind and Forstar.

On December 12, 2005, JB Finco, LLC (JB Finco), and AB Finco, LLC (AB Finco), were formed as Delaware LLCs. Upon formation AB Finco's members were OPLP and AB Finco Common Partner, LLC—a newly formed entity held by Al and his family. Similarly, upon

**[\*10]** formation, JB Finco's members were OPLP and JB Finco Common Partner, LLC—a newly formed entity held by Jim and his family.[8]

The membership interests in AB Finco and JB Finco function like preferred and common stock with OPLP holding a preferred return and the Common Partners holding a common interest in the respective Finco entities. The Finco operating agreements contained special tax allocations, with 80% of losses attributable to the Common Partners and 20% to OPLP. Similarly, OPLP losses from AB Finco were specially allocated 70% to Al and 30% to Jim, and the same was true in the inverse for JB Finco, with 70% of losses allocated to Jim and only 30% allocated to Al.[9]

Effective December 15, 2005, and as consideration for its preferred membership interest, OPLP contributed to AB Finco certain promissory notes from Southwind with a value of approximately $53 million, Pacifica with a value of approximately $53 million, ORD with a value of approximately $30 million[10] (collectively, Intercompany Notes), and the remaining Homebuilder Notes of AB Homebuilders with a value of approximately $66 million.

Effective December 15, 2005, and as consideration for its preferred membership interest, OPLP contributed to JB Finco certain promissory notes from Forstar with a value of approximately $61 million, JPB Investments with a value of approximately $21 million,

---

[8] On December 12, 2005, AB Portola Holdings, LLC (AB Portola), and JB Portola Holdings, LLC (JB Portola), were formed as Delaware LLCs. The initial members of AB Portola were AB Finco, holding a 90% membership interest, and Southwind—an entity owned by Al and his spouse—holding the remaining 10% membership. Similarly, the initial members of JB Portola were JB Finco holding a 90% membership interest and Forstar—an entity owned by Jim and his children—holding the remaining 10% membership. Before formation of AB Portola and JB Portola, Forstar and Southwind each held a 50% interest in Portola Project, LLC, and their interests were contributed to the newly formed AB Portola and JB Portola; however, it was deemed that JB Finco and AB Finco had made 90% of the respective contributions.

[9] Effective December 15, 2005, Jim, through contributions to JB Finco Common Partner, contributed to JB Finco a 35% membership interest in Carmel Valley Partners I, a 45% membership interest in Village Nurseries Wholesale, LLC, a 44.415% interest in Village Nurseries, LP, and his interest in a promissory note by Carmel Valley Partners I to Al and Jim. Like Jim, and effective December 15, 2005, Al made the identical membership interest contributions to AB Finco, through AB Finco Common Partner.

[10] The parties agree to this number, and it represents 50% of the receivables due from ORD.

[*11] ORD with a value of approximately $30 million[11] (collectively, Intercompany Notes), and the remaining Homebuilder Notes of JB Homebuilders with a value of approximately $65 million.

### G. *Admission of a New General Partner of OPLP, Followed by Distribution of Assets from OPLP*

Effective December 14, 2006, Oriole was admitted as a general partner in OPLP with less than a 10% interest, and OPLLC's partnership interest in OPLP was converted to a limited partnership interest. Immediately before the admission of Oriole as a partner in OPLP, the assets of OPLP were revalued and the capital accounts of OPLLC and ORD—the then partners of OPLP—were booked up to fair market value and any unrealized gain or loss was allocated to the partners. Following the admission of Oriole, OPLP had three partners, Oriole as the general partner and OPLLC and ORD as limited partners.

Effective December 28, 2006, OPLP and OPLLC entered into an Assignment and Assumption of Membership Interests (Assignment Agreement). Pursuant to the Assignment Agreement, OPLP transferred most of its assets, including all of its interest in AB Finco and JB Finco, to OPLLC. As of this date OPLLC's adjusted basis in its interests in OPLP was $60,405,079, while the inside basis in the interests transferred by OPLP was $970,980,604. Under the same Assignment Agreement ORD transferred to Southwind an interest in AB Finco valued at $7.4 million, and similarly ORD transferred to Forstar an interest in JB Finco valued at $7.4 million.

Before the Assignment Agreement OPLP financial statements reflect total assets over $1.5 billion, with OPLP's investment in the Fincos totaling approximately $1.1 billion. After the Assignment Agreement Oriole held a 7.7002% general partnership interest, ORD held a 1.0882% limited partnership interest, and OPLLC held a 91.2116% limited partnership interest in OPLP. Under the same Assignment Agreement effective as of December 28, 2006, OPLLC then transferred its interests in AB Finco and JB Finco to ORD, which in turn transferred its interests in AB Finco to Al and his affiliated entities and JB Finco to Jim and his affiliated entities.

---

[11] Like the number *supra* note 10, this number is agreed to between the parties and represents the remaining 50% of the receivables due from ORD.

[*12]  H.  *Estate Planning for Jim Baldwin*

In 2005 Jim's son Jason tragically died, survived by his spouse Eve and two minor children. Jason's estate was probated in California, resulting in a settlement in which Jason's interests in several SPEs affiliated with Jim and his family were transferred into trust for the benefit of Eve and her children (Eve's Trust).

Jim converted some of his community property interests to separate property of his spouse, Nancy. Nancy in turn entered into eight separate installment sales through the execution of Purchase and Sale Agreements with the Jami B. Trust 2, the Kelley R. Trust 2, the Jason B. Trust 2, and the Joshua B. Trust 2 (collectively, JB Grandchildren's Trusts). The JB Grandchildren's Trusts are structured as intentionally defective grantor trusts (IDGTs).

On February 28, 2007, Summit Point Investments, LLC (Summit),[12] OR Investments, LLC (OR Investments), and Otay Village Four Investments, LLC (Otay Village Four Investments), were formed. As part of Jim's estate planning objectives, Forstar, OR Management J, LLC (ORMJ), and the JB Grandchildren Trusts acquired interests in Summit, OR Investments, and Otay Village Four Investments, making various contributions of promissory notes and interests in nonredeeming[13] and redeeming[14] SPEs relating to land in various Villages. Collectively, Jim, Eve's Trust, and his surviving children, directly and indirectly (through Forstar and ORMJ), contributed all of

---

[12] More specifically, the initial members of Summit were Jim, his children, Eve's Trust, Forstar, JJJ&K Investments, L.P., JPB Family Interests Six, ORMJ, and the JB Grandchildren's Trusts.

[13] The nonredeeming SPEs include (i) Village One-West School; (ii) Village Two Commercial; (iii) Village Two Multifamily; (iv) Village Two Residential; (v) Village Two School 2; (vi) Village Two-West Residential; (vii) Village Seven Residential; (viii) Planning Area 12 Commercial; (ix) Village Thirteen Commercial; (x) Village Thirteen Golf Course; (xi) Village Thirteen Multifamily; (xii) Village Thirteen Residential; and (xiii) Village Thirteen Resort.

[14] The redeeming SPEs include (i) Village One Commercial; (ii) Village One Multi-Family 15; (iii) Village One Multi-Family 19; (iv) Village One Multi-Family 21; (v) Village One Multi-Family 47; (vi) Village One Residential Phase 2B; (vii) Village One Residential Phase 4; (viii) Village One Residential Phase 7; (ix) Village One School; (x) Village One-West Residential (NL); (xi) Village One West Residential (SL); (xii) Village Two School 1; (xiii) Village Five Multifamily; (xiv) Village Five Residential; (xv) Village Six Commercial; (xvi) Village Six Multifamily; (xvii) Village Six Residential; and (xviii) Village Six School.

[*13] their interests in ORD and 31 of the 34 LLCs—which in turn held interests in ORD.

In sum, the foregoing referenced transactions involving the transfers by Nancy and Jim, along with the formation and capitalization of Summit, OR Investments, and Otay Village Four Investments, resulted in Jim's family members' owning and participating in a greater percentage interest in OPLP through Forstar.

I.    *Estate Planning for Al Baldwin*

On June 14, 2006, Al and Deeann established four separate irrevocable trusts, each for the benefit of one of their four children, that were initially funded with $96,000 in cash—Al and Deeann each giving $12,000 per child.

In November 2006 Al formed the A. Baldwin Children's Trusts, and Deeann formed the D. Baldwin Children's Trusts, with one trust for each of their four children, collectively eight separate trusts (collectively, Chileno Bay Trusts). Al and Deeann transferred to these Chileno Bay Trusts interests in ocean front land in Cabo San Lucas, Mexico, that was being held for development of a future golf course and hotel.[15]

Al and Deeann then converted their community property interests in Montecito Village II[16] to separate property and created separate grantor retained annuity trusts (GRATs) with identical terms. On December 28, 2006, Al and Deeann each transferred 19.71153% interests in Montecito Village II to the respective GRATs. The GRATs had a two-year term with the remainder interests passing to Al and Deeann's children after the annuity payments are made.

NoteCo, LLC, was formed on February 28, 2007, as a single-member LLC in which Southwind was the sole member. Southwind

---

[15] The Chileno Bay Trusts were irrevocable trusts established as grantor trusts, with Al and Deeann paying all taxes on any income and gains, and with a defined value clause resulting in any gain passing to a charity, the Catholic Charities of Orange County, Inc.

[16] On December 22, 2006, Al and Deeann lent $5 million to Montecito Village, by promissory note payable in monthly installments. Effective December 20, 2006, Al and Montecito Village formed a general partnership named Montecito Village II. Al contributed a 39.350% interest in AB Finco Common Partner to the newly formed partnership, Montecito Village II, in receipt of an 87.6068% general partnership interest, and Montecito Village contributed the $5 million in borrowed funds, in receipt of a 12.3932% general partnership interest in Montecito Village II.

**[*14]** contributed promissory notes issued by the 34 SPEs. Southwind contributed a 10% interest in NoteCo, LLC, and its interests in several SPEs[17] related to land in Villages 1, 2, 7, and 13, in exchange for a 31.7910% interest in V13 AB Family Holdco L.P (V13 AB Family Holdco).[18] Similarly, ORMA contributed its interests in several SPEs[19] related to land in Villages 1, 2, 5, and 6, in exchange for a 34.9894% interest in V13 AB Family Holdco. Lastly, the A. and D. Baldwin Family Trust contributed its interests in several SPEs[20] related to land in Villages 1, 2, 7 and 13, in exchange for a 0.1474% interest in V13 AB Family Holdco.

On February 28, 2007, V4 AB Family Holdco, L.P. (V4 AB Family Holdco), was formed. The initial partners of V4 AB Family Holdco were entities affiliated with Al and included Southwind, ORMA,[21] and the 1985 A. and D. Baldwin Family Trust.[22]

In sum, the foregoing estate planning transactions contemplated the transfer of cash and interests in the 34 LLCs held by Southwind, ORMA, and the various trusts from Al and Deeann to their children and grandchildren and resulted in Al's family members' owning and

---

[17] The SPEs include the same listed *supra* note 13.

[18] On February 28, 2007, V13 AB Family Holdco was formed. The initial partners of V13 AB Family Holdco were entities affiliated with Al and included V13 AB Family TrustCo, Southwind, OR Management A, LLC (ORMA), and the 1985 A. and D. Baldwin Family Trust. V13 AB Family Trust contributed $20 million in exchange for a 33.0726% interest in V13 AB Family Holdco. The $20 million in funds contributed by the V13 AB Family Trust, however, were obtained through a loan from the 1985 A. and D. Baldwin Family Trust.

[19] The SPEs include the same listed *supra* note 14.

[20] The SPEs include: Village One West School, LLC, Village Two Commercial, LLC, Village Two Multifamily, LLC, Village Two Residential, LLC, Village Two School 2, LLC, Village Two West Residential, LLC, Village Seven Residential, LLC, Village Thirteen Commercial, LLC, Village Thirteen Golf Course, LLC, Village Thirteen Multifamily, LLC, Village Thirteen Residential, LLC, Village Thirteen Resort, LLC, and Planning Area 12, LLC.

[21] Southwind contributed its interests in Village Four Commercial, LLC, and Village Four Residential, LLC, in exchange for a 60.0120% interest in V4 AB Family Holdco. Similarly, ORMA contributed its interest in Village One Residential Phase 1B, LLC, in exchange for an 8.4076% interest in V4 AB Family Holdco.

[22] The A. and D. Baldwin Family Trust contributed its interests in Village Four Commercial, LLC, and Village Four Residential, LLC, in exchange for a 0.6062% interest in V4 AB Family Holdco. V4 AB Family Trust also contributed $10 million in exchange for a 33.0726% interest in V4 AB Family Holdco. The $10 million in funds contributed by the V4 AB Family Trust was obtained, however, through a loan from the 1985 A. and D. Family Trust.

**[*15]** participating in a greater percentage interest in OPLP through Southwind.

## II.     *Relevant History of OPLP*

### A.     *Recap of Ownership Structure of OPLP*

Before Jim and Al's estate planning, the ownership structure of OPLP was as follows: Oriole held a 7.7% general partnership interest, OPLLC held a 91.2116% limited partnership interest, and ORD held a 1.0882% limited partnership interest. The structure could be diagramed as follows:



As previously explained, ORD was originally owned by Al and Jim, when the third-party family was involved in OPLP. After the third-party family's investment, which ended in 2001, other entities, including Forstar, Southwind, and the 34 LLCs, were substituted for Al's and Jim's interests in ORD.

After Al's and Jim's estate planning the ownership structure of OPLP and OPLLC remained unchanged. However, the ownership structures of Forstar, Southwind, and the 34 LLCs changed to now include V13 AB Family TrustCo, V13 AB Family Holdco, V4 AB Family TrustCo, and V4 AB Family Holdco on Al and his family's side, while on Jim's side it now included Summit and Otay Village Four Investments. A diagram of this structure follows:

[*16]



### B. OPLP's Method of Accounting

OPLP tracked annual revenue and costs relating to the sale of land in Otay Ranch in an Excel schedule (CCM Schedule). The CCM Schedule also tracked the progress of its Construction Obligations and percentage of completion with respect to those obligations. In total OPLP estimated under its CCM Schedule deferred profits of some $783 million relating to CCM and $2.09 million of deferred profits relating to PCM as of December 31, 2006. The same CCM Schedule also reflected, as part of OPLP's sales or transfers of blue-top lots, reimbursements due of $86.6 million and estimated costs of completion of $244 million as of December 31, 2006.

[*17] C.  *Restructuring and Termination of OPLP*

On October 3, 2012, OPLP liquidated, and terminated as a partnership under the Code. At the time of liquidation OPLP still had outstanding Construction Obligations and had not recognized substantial amounts of deferred income relating to its method of tax accounting. At the time of liquidation, under OPLP's CCM Schedule, the deferred profits were $710,498,866 under CCM and $3,622,242 under PCM.

III.  *Tax Returns for OPLP Reporting Basis Adjustments and Tax Advice Received*

On its 2012 Form 1065 OPLP reported income of approximately $716 million, which was almost entirely attributed to its profits deferred under the CCM Schedule. OPLP, however, also reported $743,977,826 in "other deductions" attributable to its section 743(b) adjustment (i.e., its Basis Deduction). OPLP's 2012 Form 1065 was chosen for examination, and on March 20, 2020, respondent issued an FPAA disallowing $713,759,615 of originally reported deduction attributable to its section 743(b) adjustment. The FPAA also asserted penalties.

Some years earlier, and for the short year ending March 2, 2007, OPLP filed a Form 1065 (March 2007 Form 1065) reporting income of $2,638 and expenses of $202,235. This March 2007 Form 1065 also reported that there was a technical termination of OPLP under section 708(b)(1)(B) and a section 743(b) basis adjustment of $888,539,588 for OPLLC and −$275,779 for ORD.

OPLP later filed a Form 1065 for the short year beginning March 3, 2007, and ending April 20, 2007 (April 2007 Form 1065), reporting no income and expenses of $197,200 and a revised section 743(b) basis adjustment of $872,639,401 for OPLLC and −$277,732 for ORD. Attached to both returns was the following statement, signed by Oriole[23] as general partner of OPLP:

> Otay Project LP hereby elects under Section 754 of the Internal Revenue Code to apply the provision of § 734 (b) and § 743 (b) in adjusting the basis of the partnership

---

[23] The first statement attached to the March 2007 Form 1065 was signed by Al as general partner, and the second statement attached to the April 2007 Form 1065 was signed by Jim as VP of Oriole.

**[\*18]**  property for the taxable year ended . . . and all subsequent tax years.

On the basis of the foregoing statement, and Treasury Regulation § 1.743-1(k), OPLP attached the following statement to its April 2007 Form 1065:

Section 708(b)(1)(b) Termination Disclosure Statement.

On March 30, 2007 and April 20, 2007 there were multiple exchanges and together caused the transfer of a 50% or greater interest in the capital and profits of upper tier partnerships that directly or indirectly holds a 50% or greater interest in the capital and profits for the above referenced Taxpayer, causing a termination of both the upper tier partnerships and the Taxpayer pursuant to section 708(b)(1)(B) of the Internal Revenue Code. In particular, Treasury Regulation Section 1.708-(b)(2) provides in part as follows:

> Moreover, if the sale or exchange of an interest in a partnership (upper-tier partnership) that holds an interest in another partnership (lower-tier partnership) results in a termination of the upper-tier partnership, the upper-tier partnership is treated as exchanging its entire interest in the capital and profits of the lower-tier partnership.

The Taxpayer has prepared this short period return for the period of March 3, 2007, through April 20, 2007, to properly reflect the multiple exchanges on March 30, 2007, and April 20, 2007, that together cause the transfer of a 50% or greater interest in the capital and profits of the Taxpayer that were deemed to occur on April 20, 2007, pursuant to the above referenced regulation.[24]

Because all of the partnerships at issue here had section 754 elections in place, the terminations of the partnerships resulted in OPLLC's claiming a section 743(b) adjustment to its assets of OPLP. This adjustment was calculated as follows:

---

[24] A similar statement was attached to the March 2007 Form 1065, indicating a 50% or greater exchange of capital occurred on March 2, 2007.

**[*19]**

| | |
|---|---:|
| OPLLC's share of outside basis in OPLP: | $0 |
| OPLLC's share of inside basis with respect to OPLP | |
| Cash on liquidation: | $106,608,746 |
| Less estimated gain upon sale of OPLP assets: | |
| Share of estimated net gain in assets: | $988,528,061 |
| OPLLC's percentage interest in OPLP | 99.9% |
| Subtotal | $987,539,532 |
| Less 743(b) adjustment for | |
| Southbay purchase: | ($13,949,100) |
| OPLLC's share of net gain in OPLP assets: | $973,590,432 |
| OPLLC's share of inside basis with respect to OPLP: | ($866,981,686) |
| Estimated section 743(b) adjustment allocable to | |
| OPLLC with respect to Interest in OPLP: | <u>$866,981,686</u> |

A.    *Loeb Memoranda*

Loeb issued two memoranda dated September 14 and November 5, 2007, regarding the federal income tax consequences of the reorganization of OPLP and the transfers of direct and indirect partnership interests in OPLP that occurred in 2007. After reaching their conclusions Loeb's memoranda also address application of the business purpose and economic substance doctrine as applied by the courts and the "partnership anti-abuse rule" found in Treasury Regulation § 1.701-2 to these transactions.

B.    *EY Opinion*

EY issued two lengthy opinions dated October 15, 2007, and January 15, 2008, with respect to the federal income tax issues connected with restructuring transactions of the Otay Ranch real estate development project entered into by entities affiliated with Al and Jim as of April 1, 2007. EY analyzed relevant provisions of the Code, Treasury regulations, published Internal Revenue Service rulings, and judicial decisions, and concluded that, with respect to Oriole's admission to OPLP, and the nonliquidating distributions by OPLP, OPLLC, and ORD, it was more likely than not that

> (7) To the extent the distribution of the interest in V4 LLC by OPLP or OPLLC results in the distributee holding the V4 LLC interest with a basis less than the basis of such interest in the hands of the distributing entity immediately prior to such distribution, the distributing entity, if it has

**[\*20]** a section 754 election in effect for the year of such distribution, shall increase the basis of its retained assets in accordance with section 755.

In sum, EY reached nine separate conclusions as to the tax implications of these transactions. After reaching its conclusions EY's opinion also addressed the IRS's application of "the substance-over-form principles, the related sham transaction doctrine and step transaction doctrine to disregard, recast or reorder these transactions" and the "partnership anti-abuse rule" found in Treasury Regulation § 1.701-2 to these transactions. Lastly, EY's opinion addressed the penalty risks, reportable transaction analysis, and required disclosures relating to these transactions.

### C. *McKee Nelson Opinion*

The law firm of McKee Nelson, LLP (McKee Nelson), issued two opinions dated October 15, 2007, and January 15, 2008, regarding the tax consequences relating to the restructuring of the ownership of the assets and equity interests of a number of legal entities owned directly and indirectly by Al and Jim. The entities included in the opinions by McKee Nelson are OPLP, OPLLC, ORD, Oriole, Southwind, Forstar, and the 34 LLCs. Similar to EY's opinions, McKee Nelson's opinions also address the IRS's application of "the substance-over-form principles, the related sham transaction doctrine and step transaction doctrine to disregard, recast or reorder these transactions" and the "partnership anti-abuse rule" found in Treasury Regulation § 1.701-2 to these transactions.

### IV. *Expert Testimony Presented at Trial*

Petitioner offered testimony from Melissa J. Bach, the U.S. national lead for dispute and litigation support with the firm of Cushman & Wakefield Western, Inc. Ms. Bach is a real estate appraiser, holds the MAI[25] and CRE[26] designations, and was recognized, without objection, as an expert in the field of retrospective real property fair market valuation. Ms. Bach performed a retroactive appraisal by valuing portions of fee simple interests in Otay Ranch, including the Village 2 School and CPF-Sites, the Village 2 Commercial Sites, the Planning Area-12 Site, and Village 13 as of March 2 and April 20, 2007.

---

[25] The MAI or "member of the Appraisal Institute" is a designation offered by the Appraisal Institute.

[26] Counselor of Real Estate.

**[*21]** Ms. Bach concluded the retrospective fair market values for both dates were $2.4 million for the Village 2 School and CPF-4 Sites, $8.2 million for the Village 2 Commercial Sites, $30.5 million for the Planning Area-12 Site, and $199 million for the Village 13 Site.

Petitioner also offered expert testimony from Nancy Henderson, a founding partner and managing partner with the law firm of Henderson, Caverly Pum, LLP. Ms. Henderson was accepted, without objection, as an expert in estate and gift planning. Ms. Henderson practices in California with her firm and has more than 30 years of experience in complex estate planning.

Ms. Henderson reviewed Al and his spouse's estate planning, and as a whole found the plan implemented to be customary for estate planning undertaken during that same timeframe by real estate business owners residing in California holding similar objectives to those held by Al. Ms. Henderson also found the estate planning vehicles used by Al including irrevocable trusts were appropriate, the LLCs and limited partnerships used to transfer interests in real estate were customary, and the number of entities involved was typical and customary in the light of the historic structure of his real estate businesses. Ms. Henderson also concluded that the GRATs and installment sales to IDGTs established for the benefit of Al's heirs were customarily used in estate planning for real estate business owners with objectives similar to those held by Al. Ms. Henderson also found that the loans made by Al to holding companies, including the amounts and terms of the loans, were customarily used in estate planning for real estate business owners with similar objectives to those held by Al.

Ms. Henderson likewise reviewed Jim and his spouse's estate planning, and as a whole found the plan implemented to be customary for estate planning undertaken during that same timeframe by real estate business owners residing in California holding similar objectives to those held by Jim. Ms. Henderson also found the estate planning vehicles used by Jim—including the LLCs and limited partnerships used to transfer interests in real estate—were customary, and the number of entities involved was typical and customary in the light of the historic structure of his real estate businesses. Ms. Henderson concluded the installment sales to IDGTs established for the benefit of Jim's heirs were customarily used in estate planning for real estate business owners with similar objectives to those held by Jim.

**[\*22]** Respondent likewise offered expert witness testimony from Christopher M. James, Ph.D., the William H. Dial/Sun Trust Eminent Scholar and Professor of Finance and Economics at the University of Florida. Dr. James was accepted, without objection, as an expert in financial economics. Dr. James has over 45 years of professional experience in finance, previously was a senior economic advisor with the U.S. Department of Treasury, Office of the Comptroller of the Currency, and has served as a consultant for the FDIC[27] and the SEC.[28]

At the request of respondent Dr. James analyzed the transactions at issue from an economic and financial standpoint and provided the Court his opinion. Dr. James concluded there was no meaningful nontax economic benefit associated with the formation and capitalizations of the Finco entities, nor was there a meaningful nontax economic benefit associated with Oriole's replacing OPLLC as general partner of OPLP. He also concluded that OPLP artificially separated its ongoing Construction Obligations and income from the collection of Intercompany Notes and Homebuilder Notes relating to prior land sales under the CCM of tax accounting.

In rebuttal to Dr. James petitioner recalled Ms. Henderson. She explained how she had reviewed the last portion of Dr. James's report relating to technical partnership termination of OPLP and opined that his conclusions about the estate planning transactions show a "lack of understanding of estate planning for Real Estate Business Owners, which is my area of expertise and has been my profession for the past 33 years." Ms. Henderson also explained how, in fact, an important estate planning objective is reducing Al's and Jim's federal estate tax burdens and the transferring to junior family members direct or more commonly indirect interests in real estate assets with the intent and hope that the assets will appreciate after the transfers. She also noted the importance of loans for estate planning including the Intercompany Notes and how they had generated some $20 million in interest since made. Ms. Henderson disputed Dr. James's conclusion with respect to the effectiveness of Al's estate planning and noted how Dr. James's opinion with respect to estate freeze to eliminate the future appreciation, in part, of Villages 4 and 13 from Al's and Jim's federal taxable estates is evidence of its effectiveness, as this land has

---

[27] The Federal Deposit Insurance Corporation, a Federal Agency.

[28] The U.S. Securities and Exchange Commission, a Federal Agency.

[*23] significantly appreciated since the Great Recession.[29] Finally, Ms. Henderson opined how nontax objectives, including transfer of wealth to junior family members, while maintaining management and control, have been achieved through Al's and Jim's estate planning transactions.

## OPINION

I. *Burden of Proof*

Generally, in actions to readjust the Commissioner's partnership-level adjustments in an FPAA, as in other actions in this Court, the burden of proof is on the taxpayer, unless otherwise provided by statute or determined by the Court. Rules 142(a), 240(a); *Santa Monica Pictures, LLC. v. Commissioner*, T.C. Memo. 2005-104.

Respondent has pleaded new matters in his Answer, as amended, including that the step transaction doctrine, the common law economic substance doctrine, the codified economic substance doctrine found in section 7701(o),[30] the substance-over-form doctrine, and Treasury Regulation § 1.460-4(k)(4) are applicable. Under Rule 142(a), respondent bears the burden of proof with respect to any new matter.

In certain cases, the burden of proof shall be on the Commissioner if, in any court proceeding, the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any tax imposed by subtitle A or B of the Code. I.R.C. § 7491(a)(1). Nonetheless, in the case of a partnership, corporation, or trust, section 7491(a)(1) applies only if the taxpayer meets the net worth limitations that apply for awarding attorney's fees pursuant to section 7430; i.e., a corporation, trust, or partnership whose net worth exceeds $7 million is ineligible for the benefits of section 7491(a)(1). I.R.C. §§ 7491(a)(2)(C), 7430(c)(4)(A)(ii); 28 U.S.C. § 2412(d)(1)(B), (2)(B) (as in effect on Oct. 22, 1986). Respondent alleges the record does not establish that OPLP or OPLLC has met the net worth limitations. We agree. Accordingly, section 7491(a) does not apply. *See* H.R. Rep. No. 105-599, at 240, 242 (1998) (Conf. Rep.), *reprinted in* 1998-3 C.B. 747, 994, 996 (stating that the taxpayer has the burden of proving it meets the requirements in I.R.C. § 7491(a)(2)).

---

[29] Although not defined by Ms. Henderson we take judicial notice that the Great Recession was a period of worldwide economic decline from 2007 to 2009.

[30] Respondent abandoned this argument before trial.

**[\*24]** Except for the items raised as new matters in respondent's Answer, as amended, we conclude that petitioner bears the burden of proof with respect to the factual issues in the case.

II. *Analysis*

  A. *Summary of Parties' Arguments as to OPLP's Basis Deduction*

Petitioner contends that a section 743(b) adjustment was required as a result of the 50% or greater transfers of interests in upper tier partnerships. More specifically, petitioner points to Al's and Jim's transfers of interests in ORD and the 34 LLCs—the first tier in the OPLP ownership structure in March and April 2007—resulting in a deemed transfer of interests in ORD, and in turn OPLLC. Since ORD, OPLLC, and OPLP all had section 754 elections in effect, petitioner contends OPLP was required to adjust the basis of its assets under section 743(b) with respect to OPLLC.

Petitioner further contends that its 2007 basis adjustment was calculated pursuant to the express provisions of section 743(b) and in accord with Treasury Regulation § 1.743-1(d). OPLP held long-term contracts and used the CCM and PCM methods of tax accounting. Petitioner, citing Treasury Regulation § 1.460-4(k)(3)(v)(B), contends that under a hypothetical transaction (assumed upon termination of a partnership) OPLP would dispose of its assets, including its CCM contracts valued at $974 million, resulting in OPLLC's share of inside basis being negative $867 million and its outside basis being zero. Under section 743(b), a basis adjustment to OPLLC of $867 million resulted. In 2012 OPLLC's outside basis is equal to more than $743 million and, upon liquidation of OPLP, it properly reported its Basis Deduction attributable to these prior section 743(b) adjustments.

Respondent disputes OPLP's claimed Basis Deduction as not being available under the Code. Rather, he argues, the Code requires OPLP to include section 752 liabilities in calculating OPLLC's basis adjustment under section 743(b), resulting in petitioner's overstated basis. Respondent also contends petitioner acted negligently and with disregard of applicable rules and regulations in filing OPLP's 2012 Form 1065 and that petitioner does not have reasonable cause excusing the underpayment in question.

**[\*25]** B.  *Whether OPLP's Section 743(b) Basis Adjustment Was Calculated Correctly*

Under section 708(b)(1)(B) a partnership terminates if within a 12-month period there is a sale or exchange of 50% or more of the total interests in capital and profits of the partnership. This includes termination of upper tier partnerships such as OPLP. *See* Treas. Reg. § 1.708-1(b)(2). This termination results in what is referred to under the Code and regulations as a "new partnership." *See id.* subpara. (4). Accordingly, the deemed contribution of the upper tier partner's entire interest in the lower tier partnership is treated as a sale or exchange of that interest for purposes of section 743(b).

In this case the termination of OPLP occurred through Al's and Jim's estate planning transfers through the transfer of 50% or more of the total capital and profits interests in 30 of the 34 LLCs. In turn, this tiered partnership termination results in a termination of ORD, which in turn resulted in a termination of OPLLC and ultimately a termination of OPLP. On October 3, 2012, OPLP terminated and liquidated under the Code. At the time of liquidation OPLP had not recognized substantial amounts of deferred income under its CCM Schedule, including deferred profits of $710,498,866 under CCM and $3,622,242 under PCM. This termination of OPLP and recognition of deferred income is not in dispute.

Respondent disputes OPLP's Basis Deduction on several specific grounds. On brief respondent contends OPLP should be treated as retaining the right to receive payment under certain contracts, which should have been included in the calculation of any section 743(b) basis adjustment. Citing section 460, respondent contends that the Homebuilder Notes do not constitute payment since they are not cash or cash equivalents. Since OPLP retained the Construction Obligations, it continued to retain the right to payment; and any divorce between these obligations and payments should not be respected. On this theory, respondent contends that OPLLC's section 743(b) adjustment in 2007 should be only $253 million.

Respondent also argues that OPLP's basis adjustment should be disallowed since OPLP incurred liabilities that should have been included in the calculation of any section 743(b) basis adjustment. First, respondent contends that OPLP's liabilities exceed the $175 million reported since the definition of a liability under section 752 is broad and includes all obligations, including the Homebuilder entities' right to

**[\*26]** rescind the sale of land upon OPLP's failure to meet its Construction Obligations.

In his Reply Brief respondent contends that section 743 does not mandate OPLP's basis adjustment and petitioner's claims rely on an improper reading of the regulations. First respondent points us to the general and historical concepts on basis. *See* I.R.C. § 1012(a); *Stern v. Commissioner*, 39 B.T.A. 501, 506 (1939). Using these concepts, respondent contends that OPLLC's share of basis in OPLP's property (i.e., inside basis) cannot go negative and therefore must fall between zero and $28,062,072, the total amount of basis OPLP reported in its assets upon distribution of the Finco interests to OPLLC. Citing the generally applicable formula found in Treasury Regulation § 1.743-1(d)(1) for determining a partner's previously taxed capital, respondent also contends that petitioner's calculation of OPLLC's share of inside basis conflicts with section 743(b) and otherwise is illegal since the sum of OPLP's previously taxed capital and liabilities does not equal the total basis of its assets; a fundamental principle made clear in the examples of the section 743 regulations.

Petitioner disputes each of respondent's arguments. First, it contends respondent's liabilities-based argument fails since under section 752 OPLP's liabilities should be no greater than its estimated remaining Construction Obligations, which in any event are allocable to Oriole as the general partner of OPLP. Next, petitioner contends that the regulations under section 752 define liabilities to include only OPLP's Construction Obligations, and, citing Revenue Ruling 73-301, 1973-2 C.B. 215, contends these liabilities do not equal OPLP's entire basis in the Intercompany Notes.

Generally, the basis of partnership property is not adjusted upon the transfer of a partnership interest. *See* I.R.C. § 743(a). However, if a partnership has a section 754 election in effect, upon any transfer of an interest in the partnership by sale or exchange, the partnership is to adjust the basis of its assets. *See* I.R.C. § 743(b). In this case it is undisputed that OPLP had a section 754 election in effect and section 743(b) is applicable. The dispute between the parties lies in the complex issues involving application of this section and the applicable Treasury regulations. Section 743(b) provides in full as follows:

> Sec. 743(b). Adjustment to basis of partnership property.—In the case of a transfer of an interest in a partnership by sale or exchange or upon the death of a

**[*27]** partner, a partnership with respect to which the election provided in section 754 is in effect or which has a substantial built-in loss immediately after such transfer shall—

> (1) increase the adjusted basis of the partnership property by the excess of the basis to the transferee partner of his interest in the partnership over his proportionate share of the adjusted basis of the partnership property, or

> (2) decrease the adjusted basis of the partnership property by the excess of the transferee partner's proportionate share of the adjusted basis of the partnership property over the basis of his interest in the partnership.

Under regulations prescribed by the Secretary, such increase or decrease shall constitute an adjustment to the basis of partnership property with respect to the transferee partner only. A partner's proportionate share of the adjusted basis of partnership property shall be determined in accordance with his interest in partnership capital and, in the case of property contributed to the partnership by a partner, section 704(c) (relating to contributed property) shall apply in determining such share. In the case of an adjustment under this subsection to the basis of partnership property subject to depletion, any depletion allowable shall be determined separately for the transferee partner with respect to his interest in such property.

The foregoing provision of the Code is intended to increase (or decrease) the adjusted basis of the transferee partner's interest in the partnership (i.e., outside basis) upon the sale or exchange of a partnership interest or upon the death of a partner. In this case the adjustment applies to OPLLC, and the adjustment is to its outside basis in OPLP. Section 743(b) expressly provides in part that "[a] partner's proportionate share of the adjusted basis of partnership property *shall be determined in accordance with his interest in partnership capital . . . .*" (Emphasis added.) Considering this statutory text, we reject any computation adjusting a partner's basis in a partnership which does not fully consider that partner's capital interest in the partnership.

The mechanics of a transferee partner's basis adjustment are found in Treasury Regulation § 1.743-1(d), which states that generally a transferee's share of the adjusted basis of partnership property is

**[*28]** equal to the sum of their interest, as a partner, in the partnership's "previously taxed capital, plus the transferee's share of partnership liabilities." Treasury Regulation § 1.743-1(d) goes on to state that a transferee's "previously taxed capital" is equal to the amount of cash the transferee would receive upon liquidation, increased by the amount of tax loss that would be allocated to the transferee, and decreased by the amount of tax gain that would be allocated to the transferee, upon a hypothetical liquidation transaction. Treasury Regulation § 1.743-1(d)(2) defines a "hypothetical transaction" to mean the disposition by the partnership of all of the partnership's assets, immediately after the transfer of the partnership interest, in a fully taxable transaction for cash equal to the fair market value of the assets.

Petitioner takes Treasury Regulation § 1.743-1(d) to mean that OPLLC's share of OPLP's inside basis in 2007 was negative $866,981,686, since its share in partnership capital, upon a hypothetical liquidation, would result in OPLLC's receiving $106,608,746 in cash, decreased by allocable gain of $973,590,432. According to petitioner, this negative capital held by OPLLC, upon the termination of OPLP in 2007, results in a section 743(b) basis adjustment to OPLLC of this difference, $866,981,686.

After considering section 743(b) and Treasury Regulation § 1.743-1(d), we find respondent's arguments made in his briefing to be compelling. In this case the foregoing calculation resulting in the section 743(b) basis adjustment to OPLLC is illogical. The balance sheet of OPLP, which was used to make these calculations, reflects assets of only $28 million, liabilities of $71 million, and a total negative capital of $848 million. More specifically, OPLLC—the 99.9% partner in OPLP—reflects negative capital of $911,595,423 ($912 million). Petitioner provided no explanation as to these figures other than rejecting respondent's proposed changes to how the section 743(b) adjustment was made.

We find respondent's arguments compelling, since the contortion of this balance sheet was the result of prior distributions made by OPLP. OPLLC's negative capital balance is the result of the distribution of tax-deferred profits along with the distribution of OPLP's interest in the Finco entities. These prior distributions of cash (or cash equivalents) were ignored by petitioner when it calculated OPLLC's section 743(b) basis adjustment.

**[\*29]** A partnership generally selects its method of accounting and taxable year, *see* I.R.C. §§ 703(b), 706(b); it may choose a method of accounting different from the method used by its partners, *see* Treas. Reg. § 1.703-1(b)(1). In this case petitioner seeks to gain a tax benefit through these differences in accounting methods. On the one hand OPLP benefited from deferred taxable gains of some $921 million based on its use of CCM, while on the other hand OPLP claims to have made distributions of previously taxed capital of approximately $912 million to its 99.9% partner, OPLLC. This disparity cannot be the case and must ultimately be reconciled. Petitioner claims a hypothetical liquidation would result in OPLLC's receiving only $106,608,746 in cash; however, in reality it has been allocated an additional $912 million in cash based on OPLLC's capital account, which has been booked against its capital accounts as a liability or negative figure.

A primary feature of the Treasury regulations relating to section 704(b) and a partner's distributive share are the allocations of items of income, loss, etc. among partners and whether these allocations made under any partnership agreement[31] satisfy the "substantial economic effect" test. *See* Treas. Reg. § 1.704-1(b)(2). An allocation made to any partner will not be considered to have "economic effect" unless it comports with the underlying arrangements of the partners, and only if it ensures that a partner who receives an economic benefit equally bears an economic burden relating to the partnership for tax purposes. *See id.* subdiv. (ii)(*a*). In other words, any tax items allocated to a partner for tax purposes should have an equivalent impact on the amount of cash that the partner would be entitled to receive upon liquidation of the partnership. *See id.* subdiv. (ii)(*b*). Furthermore, if the partner has a deficit balance in his capital account upon liquidation, after adjustments are made for the partnership year, that partner is unconditionally obligated to restore the amount of that deficit balance to the partnership. *See id.* subdiv. (ii)(*b*)(*3*). The regulations also address when a partner's obligation to restore a deficit capital account will be respected and consistent with guidance related to section 752 including when a partner's obligation is not legally enforceable, or the facts and circumstances otherwise indicate a plan to circumvent or avoid the obligation. *See* Treas. Reg. § 1.704-1(b)(2)(ii)(*c*)(*2*).

---

[31] The term "partnership agreement" is broadly construed and includes all agreements among the partners, oral or written, and also includes state and local laws governing partnerships. *See* Treas. Reg. § 1.704-1(b)(2)(ii)(*h*).

**[\*30]** As mentioned above, and at the time of OPLP's section 743(b) adjustment, OPLLC reflected negative capital of $912 million. This negative figure is difficult to accept for a number of reasons. First, while a partner's capital account can go negative, here it defies logic that OPLLC's negative capital can realistically go beyond OPLP's entire balance sheet, which reflects total assets of $28 million and liabilities of $71 million. OPLLC's negative capital flies in the face of reality and proper tax accounting.

Second, this negative capital is fundamentally impossible from a cash perspective, meaning it is ordinarily impossible for any partner to withdraw nearly a billion dollars in capital in excess of the amount of capital that the partner previously contributed to the partnership. It is apparent this discrepancy can only be attributed to the $921 million in deferred profits listed on the CCM Schedules. In other words, for cash (or book) accounting purposes OPLP has distributed deferred gains to its partners, principally to OPLLC. However, for tax reporting purposes no gain has been recognized since OPLP retains its Construction Obligations under CCM. We refuse to accept (or otherwise recognize) this otherwise illogical disparity reflected on OPLP's balance sheet, because doing so would defy tax accounting principles and would result in a partnership with an overall negative value of $848 million.

Lastly, and importantly, to achieve a negative capital account of nearly $912 million while maintaining substantial economic effect (as required under the partnership agreement), OPLLC must (1) have an equal unconditional obligation to restore the amount of its deficit capital balance to the partnership and (2) bear an economic burden equal to its previously received economic benefit relating to the partnership for tax purposes. *See* Treas. Reg. § 1.704-1(b)(2)(ii)(*a*), (*b*)(*3*). Upon liquidation of a partnership or a partner's interest in a partnership, liquidating distributions will be made in accordance with properly maintained positive capital account balances. *See id.* subdiv. (ii)(*b*). Considering the foregoing, since OPLP has treated the prior distributions of excess capital to OPLLC of $912 million as having substantial economic effect, OPLLC holds an unconditional obligation to restore its negative capital account. Accordingly, the Basis Deduction calculation must account for OPLLC's negative capital, for the prior partnership distributions to maintain economic effect. *See id.*

Petitioner's engineered section 743(b) adjustment, absent the deferred gain found on OPLP's CCM Schedule and OPLLC's liability found in its negative capital account, is an incomplete calculation and

**[\*31]** contrary to the partnership agreement. Thus, the Basis Deduction calculation cannot be respected here. A correct section 743(b) adjustment must account for OPLLC's negative capital of $912 million and its unconditional obligation to restore this negative balance through a contribution of additional cash upon liquidation or recognition as a liability. *See* I.R.C. § 752; Treas. Reg. §§ 1.743-1(d)(1)(i), 1.704-1(b)(2)(ii)(*b*)(*3*).

In sum, we determine petitioner has not met its burden here and has failed to correctly establish the Basis Deduction under section 743(b), as claimed on OPLP's 2012 Form 1065. Accordingly, we will sustain respondent's disallowance of $713,759,615 of a more than $743 million claimed Basis Deduction reported on OPLP's 2012 Form 1065 for the 2012 tax period.

C.    *Whether the Economic Substance Doctrine Can Be Applied in This Case*

Respondent also argues that the transactions at issue lack economic substance and, in the alternative, argues the basis adjustments discussed herein should be disallowed under his authority granted under Treasury Regulation § 1.701-2. We have said this regulation, and the economic substance doctrine, are coextensive and function together as necessary. *See Tribune Media Co. v. Commissioner*, T.C. Memo. 2021-122, at \*106. Respondent uses these arguments to override OPLLC's basis adjustments reported by OPLP.

Petitioner contends that respondent should not be permitted to override the tax result mandated by section 743(b) through application of the economic substance doctrine. In support of this contention petitioner contends that section 743(b) is unambiguous and that the judicially created economic substance doctrine was never intended to apply to all provisions of the Code or to all transactions. Petitioner also contends that respondent cannot use the economic substance doctrine to otherwise attack the transactions at issue since they have economic substance.

We disagree with petitioner's argument since other federal courts have long recognized that the economic substance doctrine has required disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality. *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006). This principle is rooted in multiple Supreme Court cases. *Id.*; *see, e.g., Knetsch v. United*

**[\*32]** *States*, 364 U.S. 361 (1960); *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Gregory v. Helvering*, 293 U.S. 465 (1935).[32] In *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84 (1978), the Supreme Court explained the circumstances in which a transaction should be respected for tax purposes. The standard articulated in *Frank Lyon Co.* remains the basis for the current application of the economic substance doctrine. *See, e.g., GWA, LLC v. Commissioner*, T.C. Memo. 2025-34, at \*45–47.[33] Whether a transaction has economic substance requires a factual determination. *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 456 (1950). Accordingly, and as an initial matter, we reject petitioner's contention that the economic substance doctrine is inapplicable in this case.

### D. *The Scope of Economic Substance Inquiry*

We recognize that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Gregory v. Helvering*, 293 U.S. at 469. The Supreme Court, however, has said this right is a two-way street since "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, . . . and may not enjoy the benefit of some other route he might have chosen to follow but did not." *Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974); *see also id.* at 148 (referring to "the established tax principle that a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred"); *Founders Gen. Corp. v. Hoey*, 300 U.S. 268, 275 (1937) ("To make the taxability of the transaction depend upon the determination whether there existed an alternative form which the statute did not tax would create burden and uncertainty."). The ultimate question for us to answer is "whether what was done, apart from the tax

---

[32] *See also* Jeff Rector, Comment, *A Review of the Economic Substance Doctrine*, 10 Stan. J.L. Bus. & Fin. 173 (2004).

[33] Courts have interpreted *Frank Lyon Co.* as creating an economic substance doctrine that examines two areas or prongs: (1) whether the transaction had economic substance beyond tax benefits (objective prong) and (2) whether the taxpayer has shown a nontax business purpose for entering the disputed transaction (subjective prong). *See, e.g., ACM P'ship v. Commissioner*, 157 F.3d 231, 247–48 (3d Cir. 1998), *aff'g in part, rev'g in part* T.C. Memo. 1997-115; *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1549 (9th Cir. 1987), *aff'g* T.C. Memo. 1986-23; *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91–92 (4th Cir. 1985), *aff'g in part, rev'g in part* 81 T.C. 184 (1983).

**[\*33]** motive, was the thing which the statute [here I.R.C. § 743] intended." *Gregory v. Helvering*, 293 U.S. at 469.

This case, absent a stipulation otherwise, would be appealable to the U.S. Court of Appeals for the Ninth Circuit. *See* I.R.C. § 7482(b). Within the Ninth Circuit, the standard in determining whether a transaction has economic substance (i.e., is not a sham) is whether the transaction has any practical economic effects other than the creation of income tax losses (i.e., whether the taxpayer has shown that there was a nontax business purpose for engaging in the transaction beyond the creation of tax benefits). *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir. 1988), *aff'g Brown v.* Commissioner, 85 T.C. 968 (1985); *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d at 1548–49.

The Ninth Circuit has stated that it "generally applies a two-pronged inquiry addressing the objective nature of the transaction (whether it has economic substance beyond tax benefits) and the subjective motivation of the taxpayer (whether the taxpayer had a non-tax business purpose for the transaction)." *Reddam v. Commissioner*, 755 F.3d 1051, 1057 (9th Cir. 2014), *aff'g* T.C. Memo. 2012-106; *see Bank of N.Y. Mellon Corp. v. Commissioner*, 801 F.3d 104, 115 (2d Cir. 2015), *aff'g* 140 T.C. 15 (2013) *and* T.C. Memo. 2013-225. The Ninth Circuit has also noted, however, that "the economic substance doctrine is not a 'rigid two-step analysis,' but instead focuses holistically on whether 'the transaction had any *practical* economic effects other than the creation of income tax losses.'"[34] *Reddam v. Commissioner*, 755 F.3d at 1060 (internal quotation marks and citations omitted) (first quoting *Sacks v. Commissioner*, 69 F.3d 982, 988 (9th Cir. 1995), *rev'g* T.C. Memo. 1992-596; and then quoting *Sochin v. Commissioner*, 843 F.2d at 354).[35]

---

[34] "The economic substance factor involves a broader examination of whether the substance of a transaction reflects its form, and whether from an objective standpoint the transaction was likely to produce economic benefits aside from a tax deduction." *Reddam v. Commissioner*, 755 F.3d at 1059 (quoting *Casebeer v. Commissioner*, 909 F.2d 1360, 1365 (9th Cir. 1990)).

[35] We surveyed relevant caselaw within the Ninth Circuit to better determine application of the economic substance judicial doctrine. *See Reddam v. Commissioner*, 755 F.3d at 1057 (holding a $50 million a capital loss purportedly generated by several Cayman Islands entities lacked economic substance); *Sacks v. Commissioner*, 69 F.3d at 988 (holding a taxpayer's sale-leaseback was a sham); *Sochin v. Commissioner*, 843 F.2d at 355 (holding a taxpayer's minimal investment for ordinary losses and long-term gain was a sham); *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d at 1549 (holding fictitious loans using a circular flow of funds was a sham and not

**[\*34]** Turning back to this Court, we have sometimes followed an "integrated approach" and considered the substance of all activities, as a whole and in relation to the tax benefit, in determining whether to allow the benefit. *See Salina P'ship v. Commissioner*, T.C. Memo. 2000-352. In other cases we have adopted a "bifurcated approach" disassembling a transaction into separate steps or parts, focusing only on the portion of the transaction that results in the tax benefits at issue. *See James v. Commissioner*, 899 F.2d 905, 910 (10th Cir. 1990) ("The only transactions at issue in this case are the purported sales by the Communications Group to the joint ventures. These sales cannot be legitimized merely because they were on the periphery of some legitimate transactions."), *aff'g* 87 T.C. 905 (1986); *Smith v. Commissioner*, 91 T.C. 733 (1988), *aff'd sub nom. Karr v. Commissioner*, 924 F.2d 1018 (11th Cir. 1991), *and rev'd and remanded*, 937 F.2d 1089 (6th Cir. 1991). Here we approach the transactions at issue from an integrated approach with the ultimate goal of determining whether (or not) the Basis Deduction claimed is lacking in economic substance.

1. *Summary of Parties' Arguments as to Whether the Transactions at Issue Lack Economic Substance*

On brief petitioner argues that after a breakdown in the personal and decades-long business relationships between Al and Jim and the initiation of arbitration, the brothers took steps to separate their joint assets, including the Homebuilders Notes held by OPLP, through the sale of land at Otay Ranch.

Petitioner argues that to facilitate the separation of assets in late 2005 and 2006 the Finco entities were formed and the promissory notes previously held by OPLP were contributed to Al's and Jim's respective Finco entities. Before formation of the Finco entities, Al, through his entities, bore 50% of all risk associated with AB Homebuilder entities. The same was true for Jim—meaning he bore 50% of all risk associated with JB Homebuilders. This risk sharing changed after the formation and capitalization of the Finco entities. In further division of joint assets, in late 2006 OPLP distributed its interests in the Finco entities to OPLLC, which in turn distributed the AB Finco interests to Al and his entities, and the JB Finco interests to Jim and his entities.

---

deductible); *Zmuda v. Commissioner*, 731 F.2d 1417, 1421 (9th Cir. 1984) (holding three foreign trusts established to avoid taxes on the income from properties within the United States were shams), *aff'g* 79 T.C. 714 (1982).

**[\*35]** Petitioner contends that through OPLP's admission of Oriole as a limited partner and the division of assets to the Finco entities, both Al's and Jim's personal exposure to future construction defect litigation was reduced, supporting the proposition that there was economic substance to the transactions.

Beginning in 2007 both Al and Jim undertook estate planning, which was typical and customary in the light of the historic structure of their respective real estate businesses. Through Al's estate planning, interests in Villages 13 and 4 were transferred to newly formed entities which were held in trust for the benefit of Al's Family. Similarly, through Jim's estate planning, interests in Villages 13 and 4 were transferred to newly formed entities and in trust for the benefit of Jim's Family.

The estate planning of Al and Jim resulted in the transfer of 50% or more of the total interests in the 34 LLCs, which in turn resulted in a transfer of 50% or more of the total interests in ORD, and in turn resulted in a transfer of 50% or more of the total interests in OPLLC and resulted in a termination of OPLLC. Although respondent disputes the nature of Al's and Jim's estate planning, it is undisputed by the parties that it was these portions of the transactions at issue which resulted in a deemed sale or exchange of its entire interests in OPLP, and adjustment of OPLLC's basis.

On brief respondent argues the unstated purpose of the transactions at issue was to generate a tax deduction to shelter deferred income upon liquidation of OPLP thereby ultimately eliminating or indefinitely deferring tax upon the deaths of Jim and Al. Respondent asserted the restructuring of OPLP lacks a bona fide nontax business purpose and any practical business or economic effect on operations and activities of OPLP, Al and Jim, and their families. Respondent, more specifically, contends that the restructuring of OPLP—with the distribution of its interests in the Finco entities while retaining ongoing Construction Obligations—lacks economic substance and has a principal purpose of avoiding tax in a manner inconsistent with the Code.

Respondent contends that petitioner failed to provide valid business reasons for separating the Homebuilder and Intercompany Notes from the ongoing Construction Obligations of OPLP. According to respondent, Al and Jim retained tax lawyers who engineered a series of transactions to exploit an inside-outside basis disparity in OPLP,

[*36] inappropriately achieving indefinite deferral of income. Respondent also contends that—despite the complex restructuring—Al and Jim (and their respective families) maintained their 50/50 split of Otay Ranch. Respondent further contends the transactions at issue were not negotiated but were designed to benefit both Al and Jim from a tax standpoint. Furthermore, if Al and Jim's tax advisors intended to truly address Jim's "red and blue division" of Villages 2 and 7, then according to respondent, they would have addressed both the division of the joint assets and the liabilities for OPLP, including their joint public bond obligations. The restructuring plans, however, involved only the transfer of assets, evidencing the intent to create the Basis Deduction.

With respect to Al's and Jim's estate planning respondent contends each fails to withstand scrutiny since Jim treated Forstar as his alter ego, despite his family ownership interests. Similarly, Al treated all of the cash in his family entities as belonging to him, despite trusts' and other family members' holding interests.[36] Respondent also contends that some transactional documents were backdated, evidencing that the estate planning lacks economic substance. Although OPLP transferred the Intercompany Notes, in substance, OPLP retained ownership since the transferees were alter egos of Al and Jim. In sum, respondent contends the transactions at issue lack economic substance when we consider the objective factor.

### 2. *Application of the Objective and Subjective Inquiry*

We will first consider whether the restructuring of OPLP, followed by estate planning by Al and Jim, held objective economic substance outside of tax avoidance. To answer this question, we query whether the transactions at issue held practical economic effects outside of the tax benefits being challenged. *See Reddam v. Commissioner*, 755 F.3d at 1060–61.

From an objective standpoint we are to consider whether the transactions at issue produced economic benefits aside from tax benefits. *See Casebeer v. Commissioner*, 909 F.2d at 1365. Respondent contends this is not a kind of transaction that people would enter into without a tax motive, *see Yosha v. Commissioner*, 861 F.2d 494, 499 (7th Cir. 1988), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986), nor does the transaction pose a realistic expectation of economic profit, *see*

---

[36] The parties dispute the characteristics of Al's and Jim's estate planning and whether they should be respected. We do not find the issue controlling, since neither party disputes the termination of OPLP, followed by OPLLC, for tax purposes.

**[\*37]** *Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), *aff'g* 44 T.C. 284 (1965), and the purchase price is not roughly equivalent to the fair market value of the property, as required in *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1048 (9th Cir. 1976), *aff'g* 64 T.C. 752 (1975). Petitioner contends that transactions that shift the potential for gain or the risk of loss from one party to another have economic substance. After considering all of the evidence before us, we find respondent's argument to be the more compelling of the two.[37]

Looking at the original MOU and Judge Lewis's April 2005 order, the intent of Al and Jim was clear, namely dissolution of OPLP. In the April 2005 order Judge Lewis states:

> All joint entities holding title to mutually owned properties shall be dissolved within sixty (60) days of when the last piece of land is deeded out . . . all property transfers and divisions under the terms of this award and the MOU shall be accomplished within thirty-six (36) months from this date.

However, sometime later, on advice received from EY, it was decided that the transfer of property under the MOU was no longer to be achieved through distribution, but with the sale of property to the respective Homebuilder entities, followed by the capitalization of newly created Finco entities using Intercompany Notes and newly formed entities. Even though all of the underlying property of Otay Ranch would be transferred to Al and Jim and their respective Homebuilder entities, the Construction Obligations and the entitlement process would remain within OPLP.

In considering the formation and capitalization of the Finco entities we look to the cash funds of $21 million derived from Jim's entity JPB Investments and $53 million from Al's entity Pacifica. The cash funds were used to payoff of the Homebuilder Notes, which were then replaced with newly issued Intercompany Notes. However, the question arises as to why there was a need to replace the Homebuilder Notes with the Intercompany Notes? We find this question is properly answered by respondent. Respondent notes that

---

[37] As a threshold matter, arrangements with subsidiaries that do not affect the economic interests of independent third parties deserve particularly close scrutiny. *Coltec*, 454 F.3d at 1357.

[*38] the restructuring purportedly separated OPLP's CCM cash from its CCM contracts, and the result (according to petitioner) is that the income disappears. This separation is unnatural, from a business standpoint, and the Finco entities were merely vehicles to facilitate indefinite tax deferral, as ultimately Al and Jim, indirectly, continued to receive all payments and have all construction obligations.

These newly issued Intercompany Notes were then promptly contributed by OPLP to the Finco entities, and in turn OPLP's interests in the Finco entities were distributed to Al and Jim. The purported objective business purpose for this transaction was to minimize Al's and Jim's respective business risks associated with their homebuilding activities. We do not find this stated purpose to be compelling since substantial continued joint Construction Obligations remained within OPLP. Furthermore, entitlements to the land under the separate Villages at Otay Ranch continued within OPLP, notwithstanding the creation of the Finco entities.

We determine the flow of cash funds among Al, Jim, and OPLP to be circular. We further determine the creation of the Finco entities to be separate and apart from Al's and Jim's original goal to divest their jointly held property for future development at Otay Ranch. In other words, the formation of the Finco entities and the distribution of these assets were not undertaken to effect the straightforward agreed-to terms between Al and Jim under the MOU. Rather they were employed on the recommendation of EY and made to establish a Basis Deduction and future offset against Al's and Jim's deferred gains of $921 million, as reflected on the CCM Schedule. We do accept petitioner's premise; namely that two siblings, previously in business together, chose to conduct future business separate and apart. We decline to accept that the formation of the Finco entities was in pursuit of their goal as established under the MOU.

Furthermore, the substitution of Oriole as general partner, rather than OPLLC, appears to be principally tax driven. For years OPLP operated with OPLLC as a general partner, and upon entering dissolution, as agreed by both Al and Jim, it seems to be illogical or at the very least overly complex to insert Oriole as a new partner (likewise owned 50/50 by Al and Jim). Considering the objective reason given by petitioner, it appears the real reason for the conversion of OPLLC's interest to that of a limited partner was principally for OPLLC's tax benefit. While OPLLC's conversion to the status of a limited partner

**[\*39]** may have some perceived nontax benefit, we view this benefit to be irrelevant in comparison to the tax benefits sought through the conversion of OPLLC's interest and in calculating its outside tax basis in OPLP under section 752.

Next, under the subjective inquiry we are to determine whether a taxpayer has shown a business purpose for engaging in the transaction other than tax avoidance. *See Casebeer v. Commissioner*, 909 F.2d at 1364. The subjective factors focus on a taxpayer's expectations and motives to determine whether it has indeed engaged in a transaction for business purposes other than tax avoidance. *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d at 1549. Pointing to the fact that EY represented both Al and Jim jointly, respondent contends only related parties, not parties acting at arm's length, would have entered into these transactions.

With respect to the subjective aspect of the transactions at issue, respondent contends the restructuring "purportedly separated OPLP's right to cash payments on the CCM Notes," by conversion to Intercompany Notes, which was "an artifice to facilitate indefinite tax deferral, as ultimately, the Baldwin Brothers and their families, indirectly, continued to receive all payments and have all construction obligations." We agree; and when considering the subjective elements of the transactions at issue, we struggle to find a compelling nontax business purpose.

After examining the tax opinions rendered by EY it seems rather apparent that the transactions at issue were predetermined and engineered principally to create a substantial inside-outside basis disparity within OPLP, the Finco entities, and OPLLC, which in turn sought to achieve indefinite tax deferral for Al and Jim. *Cf. John Hancock Life Ins. Co. (U.S.A.) v. Commissioner*, 141 T.C. 1, 89 (2013) (holding the test transactions did not lack economic substance when the taxpayer determined that the "test transactions would contribute towards diversifying its investments, provide a strong yield, and match its long-term obligations"). The transactions at issue are exceedingly complex and contrived by outside tax advisors in furtherance of one goal: elimination of deferred taxable gain. Accordingly, after considering these subjective factors we cannot conclude that the transactions at issue contain a useful nontax business purpose. Although tax laws affect nearly every business transaction, tax consequences should not and cannot be the driving factor for structuring a transaction. *Gregory v. Helvering*, 293 U.S. at 469.

**[\*40]** We find the expert testimony presented by respondent compelling and supportive of our conclusions here. Dr. James first concludes that the capitalization of the Finco entities does not meaningfully change the expected pre-tax profits because before the capitalization Al and Jim held the potential pre-tax profits associated with the Intercompany and Homebuilder Notes, and they retain this same potential pre-tax profit after the transaction through their interests in the respective Finco entities. Dr. James also found Jim's preference for variable interest rate Homebuilder Notes[38] lacking meaningful economic consequences. Next, Dr. James concludes that the formation of the Finco entities failed to minimize risk in the event of default under the Homebuilder Notes by either AB Homebuilders or JB Homebuilders since Al and Jim used special tax allocations within the Finco structures (with 80% of losses attributable to the Common Partners entities) and entered into personal guaranties. Lastly, the capitalization of the Finco entities does not meaningfully change OPLP's liability risks since it maintained significant sources of assets and faced de minimis economic risk related to potential construction defect claims.

Dr. James also opines concerning Oriole's replacement of OPLLC as general partner of OPLP. He concludes Oriole's illiquid capitalization from notes due from related entities and the identified tax benefits through admission of Oriole "suggest[] that there was not a meaningful nontax economic benefit associated with Oriole replacing OPLLC as general partner of OPLP."

Dr. James opines that OPLP's distribution of its Finco interests marginally eliminated credit risk, after consideration of the special loss allocations within the Finco entities, while it equally stripped out assets within OPLP without addressing its ongoing Construction Obligations, for which Al and Jim held personal liability. Dr. James concludes the technical partnership termination of OPLP lacks economic effect since it involves circular loans among related entities and the use of an estate freeze to eliminate the future appreciation, in part, of Villages 4 and 13 from Al's and Jim's federal taxable estates, which could have been achieved by transferring a partial interest in these Villages through the children's (and grandchildren's) indirect ownership interest in OPLP. Lastly, Dr. James adds that OPLP's technical partnership termination in 2012 lacks economic effect since it artificially separated income

---

[38] Jim elected variable rate Homebuilder Notes for JB Builders, while Al did not. Consequently, JB Builders owed $5.6 million less in interest under the Homebuilder Notes than the AB Builder entities.

**[\*41]** contrary to the legal concept of "previously taxed" income intended under section 743(b) adjustments. He also points to the subsequent cancellation of 80% of the total Homebuilder Notes between AB Homebuilders and AB Finco through consolidation into a new entity— thereby resulting in full repayment—in 2020 as further evidence that OPLP's technical partnership termination in 2012 lacks economic effect.

At trial evidence was presented reflecting how Al and Jim, after years of business together, were compelled to split their joint business operations. Al commenced arbitration in June 2002, and an MOU was signed between Al and Jim on December 21, 2002. The original goal of the MOU was to divide the business operations regarding Otay Ranch held jointly by Al and Jim within OPLP. However, upon both Al's and Jim's retaining Mr. Wasserman and EY, the terms of the MOU were materially revised, namely involving the formations of the Finco entities and the substitution of Oriole as the limited partner of OPLP. We find the formation and funding of the Finco entities to be inconsistent with Al and Jim's overall plan for division of development of land at Otay Ranch.

Respondent also correctly points us to the public bond and construction obligations which OPLP retained as evidence that Al and Jim did not intend to actually separate all business operations. Accordingly, we conclude that the transactions at issue were a tax-driven sham since these transactions primarily resulted in mere tax benefits. In other words, when considering the nontax reasons for the transactions at issue, any third-party investor would not benefit from the restructuring and distributions from OPLP.

When a taxpayer improperly implements applicable provisions of subchapter K of the Code, we find ourselves compelled to find its actions abusive, or otherwise lacking in economic substance, without a factual finding that the planning contained objective economic substance beyond mere tax benefits and nontax business motivations. *See Reddam v. Commissioner*, 755 F.3d at 1057. In sum, and as additional grounds for disallowance of the Basis Deduction claimed, we accept respondent's arguments and determine the transactions at issue should be disregarded for lack of economic substance.

**[\*42]** III.    *The Imposition of Section 6662 Penalties*

Respondent also seeks to impose the substantial valuation misstatement penalty, the gross valuation misstatement penalty, and an accuracy related penalty based on negligence.

A.    *Application of the Substantial Valuation Misstatement and Gross Valuation Misstatement Penalties*

The Code imposes a penalty equal to 20% of the amount of the underpayment for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." I.R.C. § 6662(a), (b)(3). A misstatement is "substantial" if the adjusted basis of any property claimed on a return is 150% or more of the correct amount. I.R.C. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement[]." I.R.C. § 6662(h). A misstatement is "gross" if the value or adjusted basis of property claimed on the return exceeds 200% of the correct amount. I.R.C. § 6662(h)(2)(A)(i).

Since the adjusted basis of OPLLC originally claimed on the return was $744 million—which is well in excess of 200% of the amount determined here by this Court—we find that the adjusted basis reported by OPLP is a "gross valuation misstatement." This finding triggers application of the 40% gross valuation misstatement penalty under section 6662(e)(1)(A) and (h) to those portions of the 2012 underpayment in excess of 200% of the adjusted basis amount, as permitted by respondent.

B.    *Application of the 20% Accuracy-Related Penalty*

Next, respondent seeks to impose an accuracy-related penalty under section 6662(b)(1) and (c) on any portions of the underpayment not attributable to the foregoing 40% gross valuation misstatement penalty.

Section 6662(a) imposes a penalty equal to 20% of the portion of an underpayment of tax attributable to a taxpayer's negligence or disregard of rules or regulations. *See* I.R.C. § 6662(a) and (b)(1). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code, and the term "disregard" includes any careless, reckless, or intentional disregard. *See* I.R.C. § 6662(c).

This penalty would apply to what might be called the "lower tranche" of the underpayment, i.e., the portion of the underpayment by

[*43] OPLP that was not attributable to a valuation misstatement. *See Oconee Landing Prop. v. Commissioner*, T.C. Memo. 2024-25, at *75 (citing *Plateau Holdings, LLC v. Commissioner*, T.C. Memo. 2021-133, at *2). While the determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level, *see Plateau Holdings*, T.C. Memo. 2021-133, at *4, we can, however, determine at the partnership level the applicability of the penalty, *see Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 233 (2018); *Oconee*, T.C. Memo. 2024-25, at *75. The Commissioner has no burden of production with respect to penalties in a TEFRA partnership action. *Dynamo Holdings*, 150 T.C. at 236. Thus, the burden of showing that the negligence penalty does not apply—including the availability of any defenses—is on petitioner. *See id.* at 236–37.

C.     *Reasonable Cause Defense to Penalties*

Petitioner has raised the defense of reasonable cause to the assertion of all penalties in this case. A taxpayer may avoid a section 6662 penalty by showing that there was reasonable cause for the underpayment and that the taxpayer acted in good faith. I.R.C. § 6664(c)(1); *Higbee v. Commissioner*, 116 T.C. 438, 448–49 (2001). The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, considering all of the pertinent facts and circumstances, including the taxpayer's efforts to assess the proper tax liability and the taxpayer's knowledge, experience, and education. Treas. Reg. § 1.6664-4(b)(1).

One possible ground for claiming "reasonable cause" is reliance on professional advice. Treas. Reg. § 1.6664-4(b). We have said that "if a taxpayer alleges reliance on the advice of a tax professional, that 'advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment.'" *Oakhill Woods, LLC v. Commissioner*, T.C. Memo. 2020-24, at *29 (quoting *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), *aff'g* T.C. Memo. 2004-279); *see Gustashaw v. Commissioner*, 696 F.3d 1124, 1139 (11th Cir. 2012), *aff'g* T.C. Memo. 2011-195. "Advice hardly qualifies as disinterested or objective if it comes from parties who actively promote or implement the transactions in question." *Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1382 (Fed. Cir. 2010). "A taxpayer advancing a reliance-on-professional-advice defense must also show that it actually relied in good faith on the advice it received." *Oakhill Woods*, T.C. Memo. 2020-24, at *29; *see also Neonatology*

[*44] *Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

On brief petitioner contends OPLP acted reasonably and in good faith by relying on the advice of multiple advisors in reporting its Basis Deduction. Specifically, petitioner points to the written opinions received from EY and Loeb before the transactions at issue. OPLP provided these advisors with a host of information requested, including the business operations of Al and Jim; an explanation of the entitlement process and ongoing development of the Otay Ranch using the Homebuilder entities, including information concerning use of CCM; estate planning for both Al and Jim; and the underlying issues in dispute and in arbitration. After reviewing the opinions, it is apparent to us that both EY and Loeb well understood the business activities of Al and Jim and the underlying dispute which led to arbitration. Petitioner also points to the advice received from Al and Jim, respectively, relating to their estate planning. Finally, petitioner points us to the subsequent advice they obtained, after the transactions at issue were completed, from McKee Nelson, a law firm recognized nationally as experts on matters of partnership taxation.

Respondent disputes Al and Jim's reliance on the tax advice received from the EY and Loeb firms. Moreover, respondent contends that Al's agent withheld relevant information from McKee Nelson when rendering its tax advice. Finally, respondent contends that the EY representations, found in its two opinions, were obviously false and that Al and Jim knew, or should have known, these representations were false. We disagree with respondent's argument here since he fails to point us to any specific material (or otherwise relevant) information withheld by Al (or his agent),[39] and he has likewise failed to establish how Al and Jim "knew or should have known these representations" made by EY and Loeb were in fact false.

Treasury Regulation § 1.6662-3(b)(1) states that a return position that has a reasonable basis, as defined in paragraph (b)(3), is not attributable to negligence. This same regulation defines "reasonable basis" to be a relatively high standard of tax reporting, that is, significantly higher than not frivolous or not patently improper. However, if a return position is reasonably based on one or more

---

[39] Respondent only points us to Al's and Jim's alleged misrepresentation to McKee Nelson that, at the time of the transactions at issue, there was no plan or intention to liquidate OPLP. We do not find this representation (at the time it was made) to be materially false, as alleged by respondent.

**[\*45]** "authorities," the return position will generally satisfy the reasonable basis standard even though it may not satisfy the substantial authority standard. Authorities include the Code, the regulations, revenue rulings and procedures, court cases, and congressional committee reports. Treas. Reg. § 1.6662-4(d)(3)(iii). It is undisputed that the position taken by OPLP on its 2012 Form 1065 is predicated upon the tax advice received. Having reviewed the opinions from EY, Loeb, and McKee Nelson, we are satisfied that each contains substantial authority for each and every conclusion reached therein.

"Negligence has been defined as lack of due care or failure to do what a reasonably prudent person would do under like circumstances." *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at \*70 (citing *Ocmulgee Fields, Inc. v. Commissioner*, 132 T.C. 105, 123 (2009), *aff'd*, 613 F.3d 1360 (11th Cir. 2010)). It "includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return." Treas. Reg. § 1.6662-3(b)(1).

With respect to petitioner's reasonable cause defense we look to OPLP's tax matters partner and petitioner, Oriole, which in turn was wholly owned and controlled by Al and Jim. Jim is deceased; however, Al appeared and testified at trial. The parties have received substantial tax opinions rendered in this case, from EY, Loeb, and McKee Nelson. The tax advice being rendered is undisputably complex and involves unique issues such as CCM and basis calculations within subchapter K. Although no opinions made guaranties that they would be followed by this Court, the opinions reached a confidence level of substantial authority on each material issue relating to the transactions at issue.

Considering the above, we find Al's and Jim's reliance thereon to be reasonable and predicated upon their ordinary understanding of the Code, and with the opinions rendered being evidence of their reasonable care and their efforts to comply with these complex provisions of the Code. The substantial detail found in each opinion runs counter to the notion of negligence; and the fact that Al and Jim obtained three separate opinions only further negates any claims of negligence on their part. In sum, we find petitioner's reasonable cause defense to be compelling after considering the substantial efforts and expense undertaken on the part of Al and Jim in seeking tax advice with respect to implementing Judge Lewis's April 2005 order.

**[\*46]** Considering the foregoing, we will not sustain the imposition of penalties in this case.

IV.     *Conclusion*

Principally, having determined that OPLP incorrectly determined its basis adjustment under section 743(b), we will sustain respondent's disallowance of its Basis Deduction. We will further sustain respondent's disallowance of its Basis Deduction having also determined, in the alternative, that the transactions at issue should be disregarded as shams lacking economic substance. However, on the basis of its established reasonable cause defense, we will overrule respondent's imposition of penalties in this case.

We have considered all arguments that the parties made, and to the extent they are not addressed herein, we consider them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered under Rule 155.*